UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOSEPH COTE,<br><br>    Plaintiff,<br><br>    v.<br><br>WMBE PAYROLLING, INC., d/b/a TARGETCW and<br>BIO-RAD LABORATORIES, INC.,<br><br>    Defendants. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Joseph Cote, by and through undersigned counsel, and complains against the Defendants, WMBE Payrolling, Inc. d/b/a TargetCW and Bio-Rad Laboratories, Inc., as follows:

JURISDICTION AND PARTIES

1. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*, the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831, *et seq.*, as enforced through the MHRA, and the Maine Substance Use Testing Act ("SATA"), 26 M.R.S. §§681, *et seq.*

2. Joseph Cote ("Mr. Cote') is a United States citizen residing in Portland, Maine.

3. Mr. Cote was an "applicant" as that term is defined under the ADA, MHRA and SATA.

4. Mr. Cote was an "employee" as that term is defined under the ADA, MHRA, WPA, and SATA.

1

5. Bio-Rad Laboratories, Inc. ("Bio-Rad") is a Delaware corporation with headquarters in Hercules, California.

6. Bio-Rad employs more than 8,000 employees.

7. Bio-Rad is an "employer" as that term is defined under the ADA, MHRA, WPA, and SATA.

8. WMBE Payrolling, Inc. d/b/a TargetCW ("TargetCW") is a California corporation with headquarters in San Diego, California.

9. TargetCW employs more than 7,000 employees.

10. TargetCW is an "employer" as that term is defined under the ADA, MHRA, WPA, and SATA.

11. Bio-Rad had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

12. TargetCW had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

13. Defendants are not subject to a federally mandated drug and alcohol testing program such as the federal Omnibus Transportation Employee Testing Act of 1991.

14. This Court has subject matter jurisdiction over Mr. Cote's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

15. On or about September 11, 2017, Mr. Cote filed a timely Complaint/Charge of Discrimination against Bio-Rad and TargetCW alleging unlawful disability discrimination and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

16. On or about December 17, 2018, the MHRC issued a Notice of Right to Sue with respect to Mr. Cote's MHRA and WPA claims.

17. On or about December 19, 2018, the EEOC issued a Notice of Right to Sue with respect to Mr. Cote's federal law claims.

18. SATA does not require administrative exhaustion.

19. Mr. Cote has exhausted his administrative remedies with respect to all claims set forth in this Complaint that require administrative exhaustion.

## JURY TRIAL REQUESTED

20. Mr. Cote requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

21. Bio-Rad is a provider of scientific and healthcare related products and services.

22. Bio-Rad has a facility in Portland, Maine.

23. TargetCW located and screened temporary employees for Bio-Rad at its Portland facility.

24. TargetCW was the employer of record for temporary employees at Bio-Rad's Portland facility. It managed and held the liability for contingent workers including workers compensation, unemployment claims, insurance coverage, benefits, online time-keeping, all tax withholdings and reporting.

25. TargetCW handled the enrollment process (on-boarding), employee queries, and off-boarding.

26. TargetCW and Bio-Rad were joint employers of temporary employees at the Portland facility in that they share the control and supervision of such employees.

27. Mr. Cote is a person with disabilities under the MHRA and the ADA.

28. Mr. Cote has chronic pancreatitis, which is a substantial limitation of the digestive system, a major bodily function. The main functional limitation Mr. Cote has is chronic pain which is intensified by prolonged physical activity and/or standing for long periods of time.

29. At the time of these events, Mr. Cote was taking prescribed medication for his chronic pain, i.e., oxycodone as needed, usually 5-15 mg per day.

30. Mr. Cote has never used any recreational drugs.

31. On about April 11, 2017, TargetCW advertised job openings for Manufacturing Associates to work at Bio-Rad in Portland.

32. Mr. Cote applied for one of the positions.

33. Mr. Cote's initial contact with TargetCW was with Aaron Arce.

34. On May 24, 2017, Mr. Arce set up an interview for Mr. Cote with Kendra Gorham at Bio-Rad the following day.

35. Ms. Gorham was a Production Supervisor for Bio-Rad.

36. On May 25, 2017, Mr. Cote interviewed with Ms. Gorham at the Bio-Rad facility. It went well. Ms. Gorham told Mr. Cote that he was overqualified but that was alright because there were many different tasks that Mr. Cote could help with after his daily routine was done.

37. Mr. Cote's job duties were going to include cleaning chemical glassware, taking out biohazard boxes, lab cleaning, transportation of materials, and so on.

38. On May 26, 2017, Mr. Cote received an offer letter by email from TargetCW for employment as a full-time Manufacturing Associate – Temp (12 months) with Bio-Rad at their Portland location making $13.00 per hour. The anticipated start date was Monday, June 5, 2017.

39. Kylie Brase was Mr. Cote's hiring manager for TargetCW.

40. Mr. Cote accepted the job offer.

41. As of Wednesday, May 30, 2017, Mr. Cote had not heard back from the onboarding department at TargetCW. At 5:17 PM Eastern, Mr. Cote sent Mr. Arce an email asking if he could look into it.

42. The specific dates and times of events described below are from Mr. Cote's phone and email account.

43. The events described in the immediately following paragraphs took place on Wednesday, May 31, 2017.

44. 12:38 PM Eastern: Mr. Arce called Mr. Cote to clarify his contact information. They had the wrong e-mail address. Mr. Cote provided Mr. Arce with the correct e-mail.

45. 12:46 PM Eastern: Ms. Brase called Mr. Cote and told him that she was his account manager. Ms. Brase told Mr. Cote that he needed to go through the onboarding process and to check his e-mail to make sure he got the links she sent him. He did, at 12:44 PM.

46. 2:16 PM Eastern: HR Assistant Sam Kim e-mailed Mr. Cote to set up a drug test. Mr. Kim said he could not find a facility in Mr. Cote's area code (04101).

47. Mr. Kim did not provide Mr. Cote with a copy of a substance use testing policy for either Defendant.

48. On information and belief, neither Defendant in this matter had an approved substance use policy for purposes of SATA. Neither Defendant has provided a copy of their policy despite a written request.  In addition, SATA requires that an employer submit a copy of their final written policy to the Maine Department of Labor for review and approval.  26 M.R.S. §683(2) and 26 M.R.S. §686.

49.  Employers are precluded from implementing a substance use policy or conducting any substance use testing "until the Department approves the policy." 26 M.R.S. §683(2).

50.  Therefore, each of the Defendants was precluded by SATA from implementing any substance use testing policy or conducting any substance use testing during the timeframe at issue in this case.

51.  Defendants allege that all potential temporary employees are required to take and pass a drug screen.

52.  The requirement of a drug screen was not disclosed to Mr. Cote until after he accepted the job offer.

53.  The advertisement for the Manufacturing Associates job did not mention a drug screen.

54.  The requirement of a drug screen was not mentioned to Mr. Cote by Mr. Arce or Ms. Gorham.

55.  The offer letter received by Mr. Cote reads, "This offer is contingent upon a successful background check if required…" The letter said nothing about a drug screen.

56.  The job posting and offer letter did not mention that drug screening was part of the hiring process, so Mr. Cote responded to Mr. Kim as follows:

> "Actually, I had a question about that. As you know, 66% of the drugs screened for on a multi-panel drug test are either prescribed medications or legal substances (in my state, Maine, marijuana is now legalized for example). Normally, I refuse to take drug tests as a requirement for employment. This is because it is possible for companies to discriminate against disabled people, or discriminate against recreational drug users but not alcoholics (for example). My stance is based on ethics and thus, doesn't really change.
>
> "I was never told that drug screening was a requirement for employment, so I'm not sure what to do about that."

57.  Mr. Kim did not reply.

6

58. 4:32 PM Eastern: Mr. Cote e-mailed Mr. Kim again that he was willing to take a test for non-prescription drugs but that if the test was for prescription drugs, he wanted to be sure the results were not used to discriminate against people with disabilities. Mr. Cote wrote:

> "Anyways, I am willing to take a test on drugs that aren't medications. If you want me to take a test for medications, then I need to know a lot more about that test and how that information will be used so that it can't discriminate against people with disabilities."

59. 5:37 PM Eastern: Mr. Kim e-mailed Mr. Cote and stated that Bio-Rad wanted the test done and reiterated that the job was contingent on Mr. Cote passing a drug screen and background check. Mr. Kim wrote,

> "Thank you for your response.
>
> "While marijuana is legal there, it is also legal in California as well. Bio-Rad goes by the Federal Standard, meaning that it is not federally legal. If you test positive for THC/marijuana you can be disqualified based on the company policy which aligns with the Federal ruling/law.
>
> "If you have a medical condition that requires you to take medications, the MRO [Medical Review Officer] will contact you and have you send in your prescription(s).
>
> "If you have any further questions, please reach out to Kylie, Account Manager, at 858-810-[****]."

60. Mr. Kim's email did not indicate what information would be reported to Bio-Rad from the drug test and did not reassure Mr. Cote that the information would not be used to discriminate against people with disabilities.

61. SATA requires that an employer intending to use a substance use test must provide employees and applicants with a copy of the policy in advance of any test. The written policy must, among other things, include information about the employer's procedure to ensure the confidentiality of test results as required by SATA. 26 M.R.S. §683(2) and (3). SATA requires that the results of substance use tests be treated as confidential and only disclosed to

"the employee or applicant who is tested, any necessary personnel of the employer and a provider of rehabilitation or treatment services." 26 M.R.S. §685(3).

62. Therefore, the information regarding the confidentiality of the results of his test requested by Mr. Cote and not provided by Bio-Rad was information to which Mr. Cote was entitled under the law and which should have been provided to him in writing prior to any testing.

63. Mr. Cote wanted to know if Bio-Rad would receive a report that simply said "Passed" because someone verified that he takes prescription Oxycodone, or if Bio-Rad would get a report that said something like, "He had Oxycodone in his system for medical reasons," which could indicate to Bio-Rad that Mr. Cote has chronic pain and is disabled.

64. 5:55 PM Eastern: Mr. Cote e-mailed Mr. Kim to find out what conditions were considered disqualifying. Mr. Cote told Mr. Kim that he had concerns about Defendants' drug testing policy since it could be used to indirectly discriminate against people with disabilities.

> "Okay, so I just need to know what conditions are considered disqualifying, as in, you guys are firing me. I was already offered the job and at no point was a drug screen mentioned as a requirement. Since drug tests are medical documents for people with disabilities and covered by HIPPA[1] (sic) and the ACA[2] (sic), I wanted to make sure that employers were not given that information and therefor given the opportunity to discriminate against hiring someone. Does that make sense? If the lab sent off the test results to the employer, that employer would know if someone were disabled and then discriminate based on that, while saying it was for another reason (ie they already decided on someone else to hire).
>
> "You e-mailed me to set up the test, so I just want to know more about it. My understanding was that I had the job. I was then told that you guys wanted me to 'pass' a drug test, which is very vague. How is a 'pass' determined?"

---

[1] Mr. Cote was referring to HIPAA, the Health Insurance Portability and Accountability Act, which contains provisions that protect the confidentiality of health information.

[2] Mr. Cote was referring to the ADA.

65. Again, the information requested by Cote in his 5:55PM email was information which he was entitled under SATA.

66. 6:26 PM Eastern: Mr. Kim told Ms. Brase to call Mr. Cote regarding his concerns about Defendants' drug testing policy.

67. Ms. Brase called Mr. Cote and they spoke for 28 minutes, 31 seconds.

68. Ms. Brase told Mr. Cote that TargetCW had to pass along the information in the drug test to Bio-Rad.

69. Bio-Rad passing information regarding Cote's drug test to TargetCW would violate SATA's confidentiality provision. 26 M.R.S. §685(3).

70. Mr. Cote objected to this, stating that if they did, Bio-Rad could discriminate against people with disabilities since 40% of the drugs tested for are medicines people with disabilities use (opioids and amphetamines).

71. Mr. Cote also mentioned medical marijuana, which would have made it 60%, but conceded that since marijuana is not legal at the federal level, he would not object to that.

72. Ms. Brase said that she would talk to Mr. Kim about Mr. Cote's concerns.

73. 7:18 PM Eastern: Mr. Cote was still concerned about the drug testing policy after his conversation with Ms. Brase.

74. Mr. Cote sent an e-mail to Ms. Brase explaining that he has a physical disability and that he was requesting reasonable accommodations.

75. Mr. Cote attached a doctor's note to his email.

76. Mr. Cote's email read:

> "Hello again. I would just like to let you know that I have a physical disability and am requesting reasonable accommodations from BioRad. Please let them know that I will need some kind of lifting or moving aid for very heavy objects. A dolly or cart, for example, especially for objects over 50 lbs. I would also like the

opportunity to sit if possible while doing work for long periods of time (such as standing to do dishes, when I could use a stool instead). I will attach my accommodations letter below. It is from last year, but I can have my doctor write up a new one if you want. Thank you!"

77. 7:26 PM Eastern: Ms. Brase replied, with a copy to Mr. Kim, stating that she would ask Bio-Rad if it could accommodate Mr. Cote's needs. She also told Mr. Cote there were no drug and health testing sites near the address he provided (04101), and requested that Mr. Cote provide another ZIP code.

78. 7:28 PM Eastern: Mr. Cote responded by asking Ms. Brase to expand the search radius and/or check zip code 04103.

79. 7:36 PM Eastern: Ms. Brase responded to Mr. Cote that Mr. Kim would assist him in getting his drug test set up. She copied her email to Mr. Kim.

80. On Thursday morning, June 1, 2017, Mr. Cote sent an email to Ms. Brase with a copy to Mr. Kim about his concerns about how the drug test could be used to discriminate against people with disabilities. He wrote:

> "… I have already expressed my concerns with TargetCW about their stance that any job offer is contingent on 'passing' a drug screen / test. I have explained that some of the drugs tested for are legally prescribed medications used by people with disabilities, and that this policy could be used to discriminate against people with disabilities, as someone with a disability is also likely to be required to take such drugs due to their underlying condition. As such, a 'positive' on a drug test is not determinant of illicit drug use (2/5 of the drugs are legally prescribed to people with disabilities, for example). The intentionality of a drug test CANNOT be to 'screen' applicants - as this would be in violation of the ADA - which states that no person can be fired, or refuse to be hired, on the basis of a disability (people with disabilities may use the medications screened for on a drug test). As such, the intentionality of a drug test MUST be to detect the illegal use of such substances, of which it could be argued that an employer has the 'right to know'.
>
> "It is my contention that to imply to BioRad (in this case) that I have 'failed' a drug test (or misleadingly combining 'drug and background test') is equivalent to saying that I was doing something illegal (see above). I have raised this concern with TargetCW - that by conveying such information if not true, may result in the withdrawal of a job offer, which would be in violation of the ADA. I will only

10

give my consent to TargetCW to use the information contained in any drug test, and will not be coerced into signing away my HIPPA (sic) rights to BioRad, who is not my employer.

"I am writing this to make it known that I am willing to take a drug test, but also wish to retain my rights as a private citizen and person with a disability. Since TargetCW has told me they 'pass along' the information to their client, I encourage them to not put anything in that report that would be a violation of HIPPA (sic), nor to infer that a drug test was 'failed', or that something 'came up', for the reasons stated above regarding intentionality. To do so would not only be misleading, but also give BioRad a reason to discriminate against someone with a disability without ever 'knowing', and thus give TargetCW a reason not to hire said person with a disability. They are shifting the blame and trying to get around the ADA with such actions and policies. I highly encourage TargetCW to review their policy regarding what information they pass along to their clients, so as to not be in knowing or unknowing violation of the ADA.

"In other words, I just want to work and be treated like a normal person. Thank you"

81. No one contacted Mr. Cote or responded to Mr. Cote's email on June 1, 2017.

82. The events described in the immediately following paragraphs occurred on Friday, June 2, 2017.

83. 6:50 PM Eastern: Mr. Cote e-mailed Ms. Brase to confirm his start date the following Monday, June 5, 2017 at 7:30 AM.

84. 7:05 PM Eastern: Fifteen minutes later, Ms. Brase called and told Mr. Cote that Bio-Rad had rescinded the job offer earlier that day.

85. Mr. Cote asked Ms. Brase a few questions regarding the timing of events leading up to the decision to withdraw the offer.

86. Ms. Brase told Mr. Cote that Krystal Collins, HR Rep for Bio-Rad, had sent her an e-mail only saying that they withdrew the offer. Ms. Brase said that the email from Bio-Rad did not give a reason. She said that it did not have anything to do with Mr. Cote's accommodations, or disability. (Mr. Cote does not recall which term she used.)

11

87. Ms. Brase said that she had talked with Bio-Rad about Mr. Cote's concerns regarding the drug test. She did not know if Mr. Kim had also talked to Bio-Rad about it in a separate conversation.

88. Ms. Brase told Mr. Cote that Bio-Rad withdrew the job offer some time after it received Mr. Cote's request for accommodations.

89. Mr. Cote told Ms. Brase that this was the exact thing that he was concerned about and a continuation of their discussion on the night of May 31st involving the ethics of drug testing and reporting, and why policy mattered.

90. Mr. Cote told Ms. Brase that he would be pursuing legal counsel in this matter, and encouraged her to keep all records of events.

91. Mr. Cote asked Ms. Brase who to contact regarding legal involvement. She told Mr. Cote that his lawyer could call her and she would send them in the right direction. She expressed her sympathies.

92. Mr. Cote thanked Ms. Brase for her candor and for patiently listening to his frustrations regarding this matter.

93. Through counsel, Complainant asked TargetCW why Mr. Cote's employment was terminated.

94. In a letter dated July 6, 2017, TargetCW responded that Mr. Cote's employment was terminated because Bio-Rad withdrew the offer of employment.

95. TargetCW has yet to explain why it did not tell Bio-Rad that Mr. Cote explicitly asked to be scheduled for a drug test and that it was TargetCW that failed to follow through.

96. Through counsel, Complainant asked Bio-Rad why the job offer to Mr. Cote was withdrawn.

97. In an undated letter received by Plaintiff's counsel on June 23, 2017, Bio-Rad stated that the contingent offer was revoked because Mr. Cote refused to take the drug test.

98. Bio-Rad's stated reason for withdrawing the job offer is false. Mr. Cote did not refuse to take a drug test. Mr. Cote asked at least three times explicitly to have one set up.

99. If Mr. Cote was scheduled for a drug test during the week of May 31, 2017, Mr. Cote would have taken it, passed, and started work on Monday, June 5, 2017 as planned.

100. Defendants never scheduled a drug test for Mr. Cote.

101. Defendants never asked Mr. Cote to set up a drug test on his own.

102. Bio-Rad did not explain the basis for its claim that Mr. Cote refused to take a drug test.

103. The Defendants filed a joint answer to the complaint filed by Plaintiff with the MHRC and EEOC. In their joint answer, Defendants shifted the reason for withdrawing Mr. Cote's job offer.

104. The new stated reason was as follows: "Bio-Rad determined that Mr. Cote was unwilling to authorize the reporting of his drug screen results and made the decision to rescind the offer for temporary employment."

105. Defendants' revised reason is also false.

106. Plaintiff was willing to have the results of his drug screen reported in a way that did not violate SATA MHRA, ADA and other laws. He specifically wrote,

> ". . . I am willing to take a drug test, but also wish to retain my rights as a private citizen and person with a disability. Since TargetCW has told me they 'pass along' the information to their client, I encourage them to not put anything in that report that would be a violation of HIPPA (sic), nor to infer that a drug test was 'failed', or that something 'came up' . . . To do so would not only be misleading, but also give BioRad a reason to discriminate against someone with a disability without ever 'knowing', and thus give TargetCW a reason not to hire said person with a disability. . . . I highly encourage TargetCW to review their policy regarding what

information they pass along to their clients, so as to not be in knowing or unknowing violation of the ADA."

107. Bio-Rad and TargetCW violated Mr. Cote's rights under the MHRA and the ADA by failing to hire him because of disability discrimination.

108. Bio-Rad and TargetCW violated Mr. Cote's rights under the MHRA and ADA by failing to make reasonable accommodations for his disability.

109. Bio-Rad and TargetCW violated Mr. Cote's rights under the MHRA and ADA by failing to hire him and terminating him in retaliation for opposing what Mr. Cote believed to be violations of the MHRA and ADA.

110. Bio-Rad and TargetCW violated the MHRA and the ADA by participating in a contractual or other arrangement or relationship that has the effect of subjecting Mr. Cote, a qualified applicant/employee with a disability, to discrimination that is prohibited by these Acts.

111. Bio-Rad and TargetCW violated the MHRA and the ADA by using selection criteria that screened out or tended to screen out Mr. Cote, a qualified applicant/employee with a disability.

112. Bio-Rad and TargetCW violated the MHRA and WPA by aiding and abetting unlawful discrimination.

113. The MHRA and ADA both define certain medical examinations and inquiries as unlawful discrimination.

114. Under the MHRA and ADA, it is lawful for an employer to require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of the applicant, and an employer may condition an offer of employment on the results of the examination.

115. Medical examinations are lawful only if the information obtained is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record and the results are only used in accordance with the ADA and MHRA. Defendants violated Mr. Cote's right to have information regarding a substance use test treated as confidential.

116. Defendants violated Mr. Cote's right under the SATA to keep all information acquired in the testing process confidential and to release the results, with Mr. Cote's consent, only to necessary personnel of the employer.

117. Mr. Cote was told that TargetCW was going to share the results of his drug test with Bio-Rad, which Mr. Cote believed to be a violation of HIPAA and the ADA. Defendants' conduct also violated the MHRA and the SATA.

118. Mr. Cote engaged in protected activity by objecting to the disclosure of his drug test to Bio-Rad. Mr. Cote believed that there was no legal basis for TargetCW to disclose the results of his drug test to Bio-Rad without assurances that the disclosure would not violate the law.

119. Bio-Rad and TargetCW withdrew the job offer that had been made to Mr. Cote because Mr. Cote asserted his rights under the MHRA, the WPA, the ADA and the SATA.

120. Bio-Rad and TargetCW violated the MHRA and the ADA by participating in a contractual or other arrangement or relationship that had the effect of subjecting Mr. Cote, a qualified applicant/employee with a disability, to discrimination that is prohibited by these Acts.

121. Bio-Rad and TargetCW violated the MHRA and the ADA by participating in a contractual or other arrangement or relationship that had the effect of subjecting Mr. Cote, a qualified applicant/employee with a disability, to discrimination that is prohibited by these Acts.

122. TargetCW violates the MHRA, ADA, and SATA by sharing the results of pre-placement drug screens with Bio-Rad.

123. Mr. Cote had a good faith belief that TargetCW's practice of sharing the results of pre-placement drug screens with Bio-Rad was illegal.

124. Mr. Cote engaged in protected activity by reporting what he reasonably believed to be a violation of law.

125. Mr. Cote engaged in protected activity by refusing to engage in an unlawful directive.

126. Defendants violated SATA by implementing substance abuse testing without first creating a written policy and obtaining the Maine Department of Labor's approval of that policy. 26 M.R.S. §683(2)

127. Defendants violated SATA by "requir[ing], request[ing], or suggest[ing] that any employee or applicant submit to a substance use test except in compliance with [SATA]". 26 M.R.S. §683.

128. Defendants violated SATA by failing to provide Mr. Cote with a copy of an approved substance use testing policy in advance of requiring him to submit to a substance use test. 26 M.R.S. §683(3)

129. Defendants violated SATA by failing to provide Mr. Cote with information to which he was entitled regarding the substance use testing. 26 M.R.S. §683(2).

130. Defendants violated SATA's confidentiality provision by insisting that information obtained by substance use testing by TargetCW be shared with Bio-Rad. 26 M.R.S. §685(3).

131. Defendants violated SATA by conditioning Mr. Cote's hire and continued employment on completing a substance use test that was not in compliance with SATA.

132. Defendants violated SATA by terminating Mr. Cote's employment because Mr. Cote sought information regarding Defendants' substance use policy to which he was entitled.

133. Each of Bio-Rad's stated reasons for terminating Mr. Cote violate SATA since Bio-Rad concedes that it terminated Mr. Cote for failing to submit to a substance use test that did not comply with SATA.

## COUNT I: ADA-Discrimination

134. Paragraphs 1-133 are incorporated by reference.

135. Defendants engaged in unlawful discrimination for purposes of the ADA.

## COUNT II: ADA-Failure to Accommodate

136. Paragraphs 1-135 are incorporated by reference.

137. Defendants failed to provide Plaintiff with reasonable accommodation in violation of the ADA.

## COUNT III: ADA-Retaliation

138. Paragraphs 1-137 are incorporated by reference.

139. Defendants engaged in unlawful retaliation for purposes of the ADA.

## COUNT IV: ADA-Unlawful Medication Examination

140. Paragraphs 1-139 are incorporated by reference.

141. Defendants' actions violated the medical examination provisions of the ADA.

## COUNT V: MHRA-Discrimination

142. Paragraphs 1-141 are incorporated by reference.

143. Defendants engaged in unlawful discrimination for purposes of the MHRA.

### COUNT VI: MHRA-Failure to Accommodate

144. Paragraphs 1-143 are incorporated by reference.

145. Defendants failed to provide Plaintiff with reasonable accommodation in violation of the MHRA.

### COUNT VII: MHRA-Retaliation

146. Paragraphs 1-145 are incorporated by reference.

147. Defendants engaged in unlawful retaliation for purposes of the ADA.

### COUNT VIII: MHRA-Unlawful Medication Examination

148. Paragraphs 1-147 are incorporated by reference.

149. Defendants' actions violated the medical examination provisions of the ADA.

### COUNT IX: WPA

150. Paragraphs 1-149 are incorporated by reference.

151. Defendants' conduct violated the WPA as enforced through the MHRA.

### COUNT X: SATA

152. Paragraphs 1-151 are incorporated by reference.

153. Defendants' conduct violated the SATA.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendants to be in violation of Plaintiff's rights;

B. Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate Plaintiff's rights;

C. Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

E. Award equitable-relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award liquidated damages in an amount equal to three times any lost wages;

I. Award penalties as provided in SATA;

J. Award nominal damages;

K. Award attorney's fees, including legal expenses, and costs;

L. Award prejudgment interest;

M. Permanently enjoin Defendants from engaging in any employment practices which discriminate on the basis of disability, involve unlawful medical inquiries, or constitute retaliation;

N. Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination or retaliation in the future;

O. Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

P. Require that Defendants train all management level employees on the protections afforded by the ADA, MHRA, WPA and SATA;

Q. Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated him because of disability discrimination and retaliation; and

R.      Grant to Plaintiff such other and further relief as may be just and proper.

Dated: February 22, 2019

/s/ Chad T. Hansen
chansen@maineemployeerights.com

Attorney for the Plaintiff
MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343